**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 1:16-cv-00605-RJ-SCY |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| SM.R. JEWELL, in her official capacity | ) | |
| as U.S. Secretary of the Interior, | ) | |
| U.S. DEPARTMENT OF THE INTERIOR, | ) | |
| and U.S. OFFICE OF SURFACE | ) | |
| MINING RECLAMATION  AND | ) | |
| ENFORCEMENT | ) | |
| | ) | |
| Federal Respondents, | ) | |
| | ) | |
| NEW MEXICO COAL RESOURCES, | ) | |
| | ) | |
| Intervenor Respondent. | ) | |

**PETITIONER WILDEARTH GUARDIANS' OPENING BRIEF**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................. iv

GLOSSARY OF ABBREVIATIONS ................................................................................ vii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 3

   I.   STATUTORY BACKGROUND ................................................................................ 3

      A.  The National Environmental Policy Act ............................................................. 3

      B.  The Mining Plan Approval Process. ..................................................................... 6

   II.  THE EL SEGUNDO MINE AND THE MINING PLAN APPROVAL ............................ 8

STANDARD OF REVIEW ................................................................................................ 10

ARGUMENT ..................................................................................................................... 11

   I.   WILDEARTH GUARDIANS HAS STANDING ............................................................ 11

   II.  OSM'S APPROVAL OF THE EL SEGUNDO MINING PLAN VIOLATED
       NEPA'S PROCEDURAL REQUIREMENTS ................................................................ 13

      A.  OSM Failed to Involve the Public in the Decision to Approve the El Segundo
          Mining Plan. ...................................................................................................... 14

         1.  NEPA's public involvement requirements ................................................. 14

         2.  OSM failed to provide for any public participation in its FONSI for the
            Mining Plan. ............................................................................................... 15

      B.  OSM's Adoption of the Leasing EA Without Independently Assessing Whether
          the EA Complied with NEPA was Arbitrary. ...................................................... 18

   III.  OSM'S APPROVAL OF THE EL SEGUNDO MINING PLAN VIOLATED
        NEPA'S HARD LOOK REQUIREMENTS ................................................................. 21

      A.  OSM Failed to Analyze Coal Transport and Combustion as Indirect  Impacts of Mining
          at the El Segundo Mine. ...................................................................................... 21

         1.  The Leasing EA did not analyze coal transport impacts. ............................. 22

         2.  The Leasing EA's cursory discussion of combustion impacts does not satisfy
            NEPA. ........................................................................................................ 24

B.   OSM Failed to Take a Hard Look at the Air Quality Impacts of Coal Mining at the El Segundo Mine.................................................................25

   1.   The Leasing EA arbitrarily dismisses $PM_{10}$ exceedances. ..........................................25

   2.   The Leasing EA did not address ozone impacts..........................................................28

   3.   The EA fails to take a hard look at $NO_2$ impacts. ........................................................29

C.   The Leasing EA Failed To Take A Hard Look at Impacts from the Lease's Greenhouse Gas Emissions.................................................................31

CONCLUSION ................................................................................................35

**TABLE OF AUTHORITIES**

<u>Cases</u>

*Baltimore Gas and Electric Co. v. NRDC*, 462 U.S. 87 (1983) ........................................4

*Bering Strait Citizens for Responsible Res. Dev. v. COE,* 524 U.S. 938 (9th Cir. 2008) ............15

*Border Power Plant Working Group v. DOE*, 260 F. Supp. 2d 997 (S.D. Cal. 2003).................22

*Calvert Cliffs' Coordinating Comm'n v. U.S. Atomic Energy Comm'n,*
    449 F.2d 1109 (D.C. Cir. 1971)............................................................................14

*Colo. Envtl. Coal. V. Dombeck*, 185 F.3d 1162 (10th Cir. 1999)...........................................10, 11

*Comm. To Save Rio Hondo v. Lucero*, 102 F.3d 445 (10th Cir. 1996) ...........................13

*Dept. of Transp. V. Public Citizen*, 541 U.S. 752 (2004)..........................................22

*Dine CARE v. Klein*, 82 F. Supp. 3d 1201 (D. Colo. 2015) ...................................23

*Friends of Marolt Park v. USDOT*, 382 F.3d 1088 (10th Cir. 2004)...............................19

*Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167 (2000)............................12

*Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257 (10th Cir. 2004) .....................15

*High Country Conservation Advocates v. USFS*, 52 F. Supp. 3d 1174 (D. Colo. 2014) ........23, 34

*Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333 (1977)...............................12

*Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585 (D.C. Cir. 1994) ........................19

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .............................................11

*Marsh v. ONRC*, 490 U.S. 360 (1989)...................................................................19

*Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) .................22

*Mid-States Coal. for Progress v. Surf. Trans. Bd.*, 345 F.3d 520 (8th Cir. 2003)....................22

*Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677 (10th Cir. 2010)...............11

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983).................11

*Natural Res. Def. Council v. Hodel*, 865 F.2d 288 (D.C. Cir. 1988) ...........................11

*New Mexico ex rel Richardson v. BLM,* 565 F.3d 683 (10th Cir. 2009)........................3, 4

*Olenhouse v. Commodity Credit Corp,* 42 F.3d 1560 (10th Cir. 1994) .........................10

*Or. Nat. Desert Ass'n v. BLM*, 625 F.3d 1092 (9th Cir. 2010).....................................17

*Or. Nat. Desert Ass'n. v. BLM*, 625 F.3d 1092 (9th Cir. 2016)....................................14

*Pennaco Energy, Inc. v. USDOI*, 377 F.3d 1147 (10th Cir. 2004)...............................18, 19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).............................3

*Rocky Mountain Wild v. Vilsack,* 2013 WL 3233573 (D. Colo. June 26, 2013).................11

*Sierra Club v. DOE*, 287 F.3d 1256 (10th Cir. 2002) ..............................................13

*South Fork Band Council of Western Shoshone of Nevada v. DOI,*
    588 F.3d 718 (9th Cir. 2009)        .....................................................................23

*Utah Shared Access Alliance v. Carpenter,* 463 F.3d 1125 (10th Cir. 2006).....................10

*Utahns For Better Transp. v. USDOT*, 305 F.3d 1152 (10th Cir. 2002).........................11

*Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017 (9th Cir. 1980) ...................19

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013).................................29

*WildEarth Guardians v. OSMRE*, 104 F. Supp. 3d 1208 (D. Colo. 2015)..............2, 16, 21, 28, 34

*WildEarth Guardians v. OSMRE*, 2015 WL 6442724 (D. Mont. Oct. 23, 2015) ..............2, 16, 21

*WildEarth Guardians v. OSMRE*, 2016 WL 259285 (D. Mont. Jan. 21, 2016)....................2

*WildEarth Guardians v. OSMRE*, Case No. 1:14-cv-00112-RJ-CG, Dkt. 98
    (D.N.M. Aug. 31, 2016) ...............................................................................3

*Wis. v. Weinberger*, 745 F.2d 412 (7th Cir. 1984) ..................................................19

## Statutes

30 U.S.C. § 1256(a). ........................................................................................................7
30 U.S.C. § 1273(c) .......................................................................................................7, 8
30 U.S.C. § 181 .................................................................................................................6
30 U.S.C. § 201 .................................................................................................................6
30 U.S.C. § 207(a) ............................................................................................................6
30 U.S.C. § 207(c) ............................................................................................................6
42 U.S.C. § 4332(2)(D)(iv) ............................................................................................19
42 U.S.C. § 4332(C) ......................................................................................................3, 4
5 U.S.C. § 706(2)(A) ......................................................................................................10
5 U.S.C. § 702 ................................................................................................................10
5 U.S.C. § 704 ................................................................................................................10

## Other Authorities

71 Fed. Reg. 61,144 (Oct. 17, 2006) ........................................................................25, 26
73 Fed. Reg. 16,436 (Mar. 27, 2008) ............................................................................28
73 Fed. Reg. 61,292 (Oct. 15, 2008) ...............................................................................5
74 Fed. Reg. 66,496 (Dec. 15, 2009)..............................................................................31
75 Fed. Reg. 6,474 (Feb. 9, 2010)...................................................................................29
Cass R. Sunstein, *The Real World of Cost-Benefit Analysis: Thirty-Six Questions
(and Almost as Many Answers)*, 114 Colum. L. Rev. 167 (Jan. 2014) .........................35
OSM NEPA Handbook, Chapter 3 § B.1 ..........................................................................6
Sarah E. Light, *NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax
on Agencies*, 87 Tul. L. Rev. 511 (Feb. 2013)................................................................35

## Regulations

30 C.F.R. § 745.13(b).................................................................................................8, 17
30 C.F.R. § 745.13(i)........................................................................................................8
30 C.F.R. § 746.11(a). ......................................................................................................7
30 C.F.R. § 746.13 ........................................................................................................7, 8
30 C.F.R. § 746.14 ............................................................................................................7
30 C.F.R. § 746.17(b) ...................................................................................................7, 8
30 C.F.R. § 746.18 ............................................................................................................8
30 C.F.R. § 931.30 ............................................................................................................7
40 C.F.R. § 1500.1 ............................................................................................................3
40 C.F.R. § 1500.1(b) .....................................................................................................14
40 C.F.R. § 1501.4(b) ...............................................................................................15, 17
40 C.F.R. § 1502.14 ..........................................................................................................4
40 C.F.R. § 1502.16 ..........................................................................................................4
40 C.F.R. § 1502.22 ....................................................................................................32, 33
40 C.F.R. § 1502.9(c) ......................................................................................................18
40 C.F.R. § 1503.4(a) ......................................................................................................17
40 C.F.R. § 1506.3(a) ........................................................................................................5
40 C.F.R. § 1506.3(c) ......................................................................................................19

40 C.F.R. § 1506.6(a) ..............................................................................14
40 C.F.R. § 1508.13 ...................................................................................5
40 C.F.R. § 1508.7 .....................................................................................4
40 C.F.R. § 1508.8 .....................................................................................4
40 C.F.R. § 1508.8(a) .................................................................................4
40 C.F.R. § 1508.8(b) ...........................................................................4, 21
40 C.F.R. § 1508.9 .....................................................................................5
40 C.F.R. § 1508.9(b) .................................................................................5
40 C.F.R. §1501.4(e) ..................................................................................5
43 C.F.R. § 3425.1-8(a) ..............................................................................6
43 C.F.R. § 3475.1 ......................................................................................6
43 C.F.R. § 3475.2 ......................................................................................6
43 C.F.R. § 46 .............................................................................................5
43 C.F.R. § 46.120(c) ...............................................................................18
43 C.F.R. § 46.305(c) ..........................................................................14, 16
43 C.F.R. § 46.120(b) .................................................................................5
43 C.F.R. § 46.120(c) .................................................................................5

## GLOSSARY OF ABBREVIATIONS

| | |
|---|---|
| APA | Administrative Procedure Act |
| AR | Document page numbers in administrative record |
| BLM | U.S. Bureau of Land Management |
| CEQ | Council on Environmental Quality |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| EPA | Environmental Protection Agency |
| FONSI | Finding of No Significant Impact |
| GHG | Greenhouse Gas |
| Guardians | Petitioner WildEarth Guardians |
| MLA | Mineral Leasing Act |
| NAAQS | National Ambient Air Quality Standard |
| NEPA | National Environmental Policy Act |
| NOx | Nitrogen oxides |
| OSM | Office of Surface Mining Reclamation and Enforcement |
| $PM_{2.5}$ | Particulate matter less than 2.5 microns in diameter |
| $PM_{10}$ | Particulate matter less than 10 microns in diameter |
| ppm | Parts per million |
| SMCRA | Surface Mining Reclamation and Control Act |
| TSP | Total suspended particulates |
| VOC | Volatile organic compound |

# INTRODUCTION

This case seeks to remedy the Federal Respondents' chronic failure to address the potentially significant environmental impacts of coal mining at the El Segundo Mine in McKinley County, New Mexico and to involve the public in their decision authorizing mining of federal coal.  The Mineral Leasing Act ("MLA"), 30 U.S.C. §§ 181-196, and the Surface Mining Reclamation and Control Act ("SMCRA"), 30 U.S.C. §§ 1201-1328, require Secretary of the Interior approval of mining plans as a prerequisite to the mining of federal coal.  Among other requirements, a mining plan must ensure that mining complies with applicable federal laws and regulations and be based on information prepared in compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4231-4370h; 30 C.F.R. § 746.13(b).

Federal Respondents U.S. Office of Surface Mining Reclamation and Enforcement ("OSM"), an agency within the U.S. Department of the Interior ("Interior"), and Sally Jewell, in her official capacity as U.S. Secretary of the Interior ("Secretary") (collectively, "OSM") have approved a mining plan authorizing federal coal development at the El Segundo Mine in northwest New Mexico.  In approving the El Segundo Mining Plan, however, OSM failed to comply with NEPA in two ways.  First, OSM violated NEPA's public notice and involvement requirements by failing to ensure that the public was appropriately notified of and involved in the agency's decision to forgo doing any analysis of mining's environmental impacts and instead adopt an existing Environmental Assessment to support the Mining Plan approval.

Second, OSM failed to take a hard look at the Mining Plan's environmental impacts.  To support its decision to approve the Mining Plan and meet its NEPA obligations, OSM prepared a two-page Finding of No Significant Impact ("FONSI") reporting that mining the federal lease would not have any significant environmental impacts.  OSM's ostensible support for this conclusion relied on an Environmental Assessment prepared for the federal coal that would be

mined under the challenged Mining Plan approval.  However, OSM simply adopted the existing document without performing the required detailed assessment of whether the adopted document met all of NEPA's requirements for a hard look at the direct, indirect, and cumulative impacts of lease development.  OSM made the conclusory statement, without any record support, that the existing Environmental Assessment was adequate and left it at that.

Coal mining is an intensive industrial activity with far reaching impacts that deserves equally intensive environmental scrutiny before garnering federal approval.  This scrutiny is vital because coal mining results in air pollution and greenhouse gas emissions that impact air quality—and, by extension, human health—and climate.  Coal mining generates air pollution in the form of particulate matter, nitrogen dioxide, ozone precursors (which form ground-level ozone), and greenhouse gases.  Additionally, environmental impacts related to coal combustion—which result only because coal is mined—can be even more extensive since coal-fired power plants generate significantly higher levels of conventional air pollutants and greenhouse gases.

This case is one in a suite of similar cases that seeks to remedy OSM's ongoing pattern of uninformed decisionmaking for mining plan approvals, a deeply flawed process that significantly threatens public health and the environment throughout the western United States.  Two courts have already determined that OSM's mining plan approval process violated NEPA for failing to comply with NEPA's public involvement and hard look requirements.  *See WildEarth Guardians v. OSMRE*, 104 F. Supp. 3d 1208 (D. Colo. 2015) ("*WildEarth Guardians I*"); *WildEarth Guardians v. OSMRE*, 2015 WL 6442724 (D. Mont. Oct. 23, 2015)[1] ("*WildEarth Guardians II*").  In a similar mining plan challenge before this Court, OSM "admitted error" in its approval

---

[1] *WildEarth Guardians v. OSMRE*, 2016 WL 259285 (D. Mont. Jan. 21, 2016), accepted in full the Magistrate Judge's finding and recommendations in *WildEarth Guardians II*, with only some minor modifications to the recommended remedy.

of a mining plan for the San Juan Mine in northwest New Mexico, and moved for voluntary remand of the case so OSM could complete an Environmental Impacts Statement for the challenged mining plan.  *See WildEarth Guardians v. OSMRE*, Case No. 1:14-cv-00112-RJ-CG, *8-9, Dkt. 98 (D.N.M. Aug. 31, 2016).  For the Mining Plan approval challenged here, OSM continues its pattern of rubber-stamping mining plans using existing NEPA documents that the agency has not independently evaluated.[2]

Accordingly, Plaintiff WildEarth Guardians ("Guardians") alleges that Federal Respondents violated NEPA and the Administrative Procedures Act ("APA"), 5 U.S.C. §§701-706, by unlawfully approving the El Segundo Mining Plan.  Guardians respectfully requests that this Court declare Federal Respondents' approval of the El Segundo Mining Plan arbitrary, and order them to comply with NEPA.

## STATEMENT OF FACTS

### I.  STATUTORY BACKGROUND

#### A.  The National Environmental Policy Act.

NEPA is the "basic national charter for protection of the environment," and the "centerpiece of environmental regulation in the United States."  40 C.F.R. § 1500.1; *New Mexico ex rel Richardson v. BLM,* 565 F.3d 683, 703 (10th Cir. 2009).  Congress enacted NEPA to ensure that Federal projects do not proceed until the federal agency analyzes all environmental effects associated with those projects.  *See* 42 U.S.C. § 4332(C); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (stating that NEPA achieves its purpose through "action-forcing procedures . . . requir[ing] that agencies take a *hard look* at environmental consequences.") (citations omitted) (emphasis added).  NEPA's hard look should provide an

---

[2] Guardians has challenges to two other mining plan approvals on similar grounds pending in the District of Wyoming.  *WildEarth Guardians v. Jewell*, Case No. 2:16-cv-0166-ABJ and *WildEarth Guardians v. Jewell*, Case No. 2:16-cv-0167-ABJ.

analysis of environmental impacts useful to both decisionmakers and the public. *Baltimore Gas and Electric Co. v. NRDC*, 462 U.S. 87, 97 (1983) (describing NEPA's "twin aims" as informing the agency and the public). "By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions." *New Mexico ex rel. Richardson,* 565 F.3d at 703; *see also Robertson*, 490 U.S. at 356 (explaining NEPA analysis "generate[s] information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision.") (citation omitted).

Under NEPA, a federal agency must prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C); 40 C.F.R. § 1501.4. In the EIS, the agency must, among other requirements, "rigorously explore and objectively evaluate all reasonable alternatives," analyze and assess all direct, indirect and cumulative effects, and include a discussion of the means to mitigate adverse environmental impacts. 40 C.F.R. §§1502.14 and 1502.16.

Direct effects include those that "are caused by the action and occur at the same time and place." 40 C.F.R. § 1508.8(a). Indirect effects include effects that "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). Cumulative effects are "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Effects" are synonymous with "impacts." 40 C.F.R. § 1508.8.

If uncertain whether a Federal action may have significant environmental impacts, the agency may prepare an Environmental Assessment ("EA") to determine whether an EIS is necessary.  40 C.F.R. § 1508.9.  Although an EA may be less extensive than an EIS, the EA must nonetheless include discussions of alternatives and the direct, indirect, and cumulative environmental impacts of the action. 40 C.F.R. § 1508.9(b).  If an agency decides not to prepare an EIS, an EA must provide sufficient evidence to support a Finding of No Significant Impact ("FONSI").  40 C.F.R. §1501.4(e).  Such evidence must demonstrate that the action "will not have a significant effect on the human environment . . . ."  40 C.F.R. § 1508.13.

The Council on Environmental Quality's ("CEQ's") NEPA regulations provide procedural means for agencies to eliminate duplicative environmental analyses.  NEPA allows an agency to adopt an existing draft or final EIS provided that the adopted material "meets the standards for an adequate statement under [NEPA's] regulations."  40 C.F.R. § 1506.3(a).  Interior's supplemental NEPA regulations[3] encourage adoption of existing NEPA analyses "[i]f [the] existing NEPA analyses include data and assumptions appropriate for the analysis at hand[.]"  43 C.F.R. 46.120(b).  The regulations further provide that:

> [a]n existing environmental analysis prepared pursuant to NEPA and the [CEQ] regulations may be used in its entirety if the Responsible Official determines, with appropriate supporting documentation, that it adequately assess the environmental effects of the proposed action and reasonable alternatives.  *The supporting record must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects.*

43 C.F.R. 46.120(c) (emphasis added).  In other words, an agency cannot adopt an existing NEPA document to meet its statutory obligations without evaluating whether conditions have

---

[3] In 2008, Interior promulgated regulations to implement NEPA. 73 Fed. Reg. 61,292 (Oct. 15, 2008); 43 C.F.R. §§ 46.10-46.450.  Interior and its agencies must use these regulations "in conjunction with and supplementary to" authorities set forth under the NEPA regulations. *Id.*

changed or new information has come to light that render prior analysis no longer adequate for evaluating the current environmental impacts of the proposed action.

OSM also adopted its own directives to implement NEPA.  *See* OSM Handbook on Procedures for Implementing the National Environmental Policy Act ("OSM NEPA Handbook").[4]  These directives emphasize that OSM may adopt NEPA documents produced by other agencies.  If OSM does so, the agency must "ensure that the findings of the documents are in full compliance with NEPA and OSM policy."  OSM NEPA Handbook, Chapter 3 § B.1.

### B.      The Mining Plan Approval Process.

Under the MLA, the Secretary has two primary responsibilities regarding the disposition of federally owned coal.  First, the Secretary is authorized to lease federal coal resources, where appropriate.  *See* 30 U.S.C. §§181, 201.  A coal lease must be in the "public interest" and include such "terms and conditions" as the Secretary of the Interior shall determine necessary.  30 U.S.C. §§ 201, 207(a); *see also* 43 C.F.R. §§ 3425.1-8(a), 3475.1.  A coal lease is issued "for a term of twenty years and for so long thereafter as coal is produced annually in commercial quantities." 30 U.S.C. §207(a) and 43 C.F.R. § 3475.2.  The U.S. Bureau of Land Management ("BLM"), an agency within the Department of the Interior, is largely responsible for implementing the Secretary's coal leasing responsibilities.

Second, the Secretary authorizes, where appropriate, the mining of federally owned coal through approval of a mining plan.  The authority to issue a mining plan is set forth under the MLA, which states that before any entity can take action on a leasehold that "might cause a significant disturbance of the environment, the lessee shall submit for the Secretary's approval an operation and reclamation plan."  30 U.S.C. §207(c).  Referred to as a "mining plan" by SMCRA

---

[4] Available at http://www.osmre/gov/lrg/docs/directive490_NEPAHandbook.pdf (last accessed Nov. 8, 2016).

and its implementing regulations, the Secretary "shall approve or disapprove the [mining] plan or require that it be modified."  *Id*.; *see also* 30 C.F.R. § 746.14.  By delegation, the Assistant Secretary for Land and Minerals ("Assistant Secretary") must approve the mining plan before any mining operations may commence on "lands containing leased Federal coal."  30 C.F.R. § 746.11(a).

Among other requirements, a Mining Plan must, at a minimum, assure compliance with applicable federal laws, regulations, and executive orders, and be based on information prepared in compliance with NEPA.  *See* 30 C.F.R. § 746.13.  A legally compliant Mining Plan is a prerequisite to an entity's ability to mine leased federal coal.  Regulations implementing SMCRA explicitly state that "[n]o person shall conduct surface coal mining and reclamation operations on lands containing leased Federal coal until the Secretary has approved the mining plan."  30 C.F.R. § 746.11(a).  To this end, a Mining Plan is "binding on any person conducting mining under the approved mining plan."  30 C.F.R. § 746.17(b).

In addition to an approved mining plan, SMCRA requires that either the Secretary or a federally delegated state surface mining agency approve a surface mining permit application and reclamation plan ("SMCRA permit") before an entity can commence mining.  *See* 30 U.S.C. § 1256(a).  The SMCRA permit governs surface disturbance for coal mining operations.  In SMCRA, Congress authorized the Secretary to delegate administrative and enforcement of SMCRA to states that have a federal approved surface mining program.  30 U.S.C. § 1273(c).  In 1982, Interior delegated SMCRA administration and enforcement authority to the State of New Mexico through the New Mexico Energy and Minerals Department.  30 C.F.R. § 931.30.

However, Congress expressly prohibited the Secretary from delegating to the states the duty to approve, disapprove, or modify Mining Plans for federally owned coal.  30 U.S.C. §

1273(c); 30 C.F.R. § 745.13(i).  SMCRA also prohibits the Secretary from delegating to states authority to comply with NEPA and other federal laws and regulations other than SMCRA with regard to the regulation of federally owned coal resources.  30 C.F.R. § 745.13(b).

Although the Secretary is charged with approving, disapproving, or modifying a Mining Plan, OSM is charged with "prepar[ing] and submit[ting] to the Secretary a decision document recommending approval, disapproval or conditional approval of the mining plan . . . ."  30 C.F.R. § 746.13.  Thus OSM plays a critical role in adequately informing the Secretary.

"An approved mining plan shall remain in effect until modified, cancelled or withdrawn . . . ."  30 C.F.R. § 746.17(b).  The Secretary must modify a Mining Plan where, among other things, there is "[a]ny change in the mining plan which would affect the conditions of its approval pursuant to Federal law or regulation", "any change which would extend coal mining and reclamation operations onto leased Federal coal lands for the first time", or "[a]ny change which requires the preparation of an environmental impact statement under the National Environmental Policy Act . . . ."  30 C.F.R. §§ 746.18(a), (d)(1), (d)(4), and (d)(5).

## II.    THE EL SEGUNDO MINE AND THE MINING PLAN APPROVAL

El Segundo is a privately owned, multiple seam surface coal mine located approximately 35 miles north of Milan in McKinley County, New Mexico.  AR 3671.  The Mine has been in operation since 2008 and, prior to the approval of the challenged Mining Plan, all mining occurred outside the blocks of federal coal within the Mine permit boundary.  *Id*.  Mining occurs in six mining areas accessed by a network of haul roads.  *Id*.  Coal is mined using a dragline and, once removed from the pit, is transported to coal-fired power plants via rail line.  *Id*.  The BNSF railroad serves the Mine with a rail spur that links to the main BNSF rail line in Grants, New Mexico.  AR 3722.  Coal is transported 150 miles along this rail line to plants in Arizona.  *Id*.

The El Segundo Mine supplies coal to multiple power plants under long- and short-term coal contracts.  AR 3749.  These plants include the Cholla Power Plant, Springerville Generating Station, and Apache Generating Station—all in eastern Arizona.  *Id*.  Coal from the El Segundo Mine is also sold to the Escalante Generating Station in Prewitt, New Mexico.  *Id*.

Without the federal coal lease, the Mine's peak annual coal production is expected to be approximately 9.81 million tons, with a cumulative production total of 133.8 million tons by 2027.  AR 3671-72.  Addition of federal coal from the Mining Plan approval, raises the cumulative total of coal production to 143.05 million tons, and extends the life of the Mine by two years.  AR 3673.

On May 16, 2014, the Secretary approved and issued a Mining Plan modification to Peabody Natural Resources for the mining of federally owned coal from Federal Lease NMNM 126813 at the El Segundo mine.  AR 243-44.  The Mining Plan approval authorized surface coal mining at a production rate of up to 7.8 million tons per year, and ultimate recovery of 9.2 million tons of coal from 435 acres.  AR 10-11.  Under the approval, the life of the mine would continue for an additional two years.  AR  3681.  The Secretary's decision to approve the Mining Plan relied on OSM's recommendation for approval.  AR 9-13.

On April 30, 2014, OSM issued a FONSI for the 2014 El Segundo Mining Plan that determined mining the lease would not have any significant environmental impacts.  AR 18-19.  Although OSM issued a FONSI, it did not provide public notice of the documents prior to signing the FONSI or approving the Mining Plan.  According to OSM, rather than performing its own analysis of mining's environmental impacts to support the FONSI, the agency relied on an EA prepared in January 2014 by BLM to support BLM's leasing decision (hereafter, "Leasing EA").  AR 18.  BLM prepared the Leasing EA to "describe the environmental impacts of leasing

the land and subsequently mining the federal coal reserves." AR 3670.  BLM originally issued a

final EA on May 28, 2013, and held the lease sale on August 14, 2013.  AR 3154.  Guardians

appealed the leasing decision to the Interior Board of Land Appeals ("IBLA") on August 26,

2013.  *Id*.  Following Guardians' appeal, BLM requested a voluntary remand of the decision

from the IBLA so the agency could perform additional analyses.  *Id*.  On November 19, 2013,

BLM issued a revised EA for public comment.  *Id*.  Guardians commented on the draft EA on

December 18, 2013.  AR 3906.[5]  BLM issued the final EA in January 2014.  AR 3658.  BLM

issued the coal lease on March 1, 2014.  AR 238.

## STANDARD OF REVIEW

Because NEPA does not include a citizen suit provision, a plaintiff may challenge final

agency action that violates NEPA pursuant to the APA.  5 U.S.C. § 702, 704; *Utah Shared*

*Access Alliance v. Carpenter,* 463 F.3d 1125, 1134 (10th Cir. 2006).  OSM's and the Secretary's

actions are reviewed under the "arbitrary and capricious" standard.  5 U.S.C. § 706(2)(A).

Agency action is unlawful and should be set aside where it "fails to meet statutory, procedural or

constitutional requirements or if it was arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  *Olenhouse v. Commodity Credit Corp,* 42 F.3d 1560, 1574 (10th

Cir. 1994) (internal quotations omitted).

Under the arbitrary and capricious standard, "[the court] must ensure that the agency

'decision was based on a consideration of the relevant factors' and examine 'whether there has

been a clear error of judgment.'"  *Colo. Envtl. Coal. V. Dombeck*, 185 F.3d 1162, 1167 (10th Cir.

1999) (citations omitted).  Agency action will be set aside if:

---

[5] Although included in the index for the Administrative Record, this document was inadvertently
omitted from the record when it was lodged with the court.  Counsel for Federal Respondents
provided the complete document to the parties via email, and the parties agreed the correction of
the record CD lodged with the Court was not necessary.  The complete document is attached
here as Exhibit 1.

> [T]he agency [h]as relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 43

(1983)).

Under NEPA, an agency action is arbitrary and capricious when it has not "adequately

considered and disclosed the environmental impacts of its actions." *Utah Shared Access*

*Alliance,* 288 F.3d at 1208 (citation omitted). The court applies a "rule of reason" in determining

whether deficiencies in NEPA analyses "are significant enough to defeat the goals of informed

decisionmaking and informed public comment." *Utahns For Better Transp. v. USDOT*, 305 F.3d

1152, 1163 (10th Cir. 2002); *Colo. Envtl. Coal.*, 185 F.3d at 1174 (holding the rule of reason

requires "sufficient discussion of the relevant issues and opposing viewpoints to enable [an

agency] to take a hard look at the environmental impacts."). Further, "a court cannot defer when

there is no analysis to defer to, and a court cannot accept at face value an agency's unsupported

conclusions." *Rocky Mountain Wild v. Vilsack,* 2013 WL 3233573, at *3 n.3 (D. Colo. June 26,

2013). The burden of proof rests with the parties who challenge agency action under the APA.

*Morris v. U.S. Nuclear Regulatory Comm'n*, 598 F.3d 677, 691 (10th Cir. 2010).

## ARGUMENT

## I.   WILDEARTH GUARDIANS HAS STANDING

To establish standing, a party must show that it has suffered an injury-in-fact, *i.e.*, a

concrete and particularized, actual or imminent invasion of a legally protected interest; that the

injury is fairly traceable to the challenged action of the defendant; and that a favorable decision

will likely redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992). A

plaintiff's members' "reasonable concerns" of harm caused by pollution from the defendant's

activity directly affecting those affiants' recreational, aesthetic, and economic interests establishes injury-in-fact. *Friends of the Earth v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 183-84 (2000).

Guardians has standing to challenge OSM's approval of the El Segundo Mining Plan. *See* Declaration of Michael Eisenfeld ("Eisenfeld Decl.") attached hereto as Exhibit 2.[6]  Mr. Eisenfeld states that the "sights and sounds of mining activities at the El Segundo coal mine detract from the natural beauty of the landscape, the night sky, the clear air, and from the sense of remoteness and wildness" of the surrounding area, and therefore impedes his recreational and aesthetic enjoyment of the area around the Mine.  Eisenfeld Dec. ¶ 11.  In addition, Mr. Eisenfeld has "observed trains filled with coal departing the mine and headed south and west toward Arizona," which also detracts from his recreational and aesthetic enjoyment of the area around the Mine.  *Id.* at ¶ 13.  Mr. Eisenfeld is a member of Guardians and has been since 2011.  *Id.* at ¶ 3.  Guardians is a nonprofit organization whose mission includes protecting the environmental and public health. *Id.*  Guardians has standing as an organization for the following reasons: its member Mr. Eisenfeld has standing to sue in his own right; the interests at stake are germane to Guardians' purpose; and neither the claim asserted, nor the relief sought requires Mr. Eisenfeld to participate directly in the lawsuit.  *See Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977).

OSM's failure to adequately analyze the air pollution from expansion of coal mining at El Segundo—including ozone, $PM_{10}$ and $NO_2$—increases the risk that Guardians' members will suffer even more harm to their aesthetic and recreational interests when they use the areas around

---

[6] Pursuant to this Court's July 5, 2016 Scheduling Order (Dkt. 74), Guardians filed Mr. Eisenfeld's declaration with the Court on October 14, 2016.  Dkt. 79-1.  A copy of Mr. Eisenfeld's October 14, 2016 declaration included here for reference.  No changes have been made to the declaration.

the Mine and from which the Mine and the coal trains are visible. Eisenfeld Decl. ¶¶ 7-12.  This

increased risk of harm is the direct result of the inadequate environmental analysis informing the

Mining Plan approval challenged here, which authorizes the mining of an additional 9.2 million

tons of coal at El Segundo over the next several years.  *See Comm. To Save Rio Hondo v.

Lucero*, 102 F.3d 445, 452 (10th Cir. 1996) ("Under [NEPA], an injury results not from the

agency's decision, but from the agency's *uninformed* decisionmaking.").  Guardians also

suffered concrete harm from the deprivation of its procedural right under NEPA to be provided

with notice of OSM's FONSI for the mining plan approval.  Eisenfeld Decl. ¶ 18.  A favorable

decision from the Court will remand the decision authorizing such damaging action and require

OSM to evaluate the environmental impacts of mining and involve the public in its new decision

on the Mining Plan.  A judicial order requiring compliance with NEPA ensures that the agency's

decision is fully informed and redresses plaintiff's injury, thereby satisfying the redressability

requirement.  *Sierra Club v. DOE,* 287 F.3d 1256, 1265-66 (10th Cir. 2002).

Because Guardians seeks to protect its members' recreational and aesthetic interests in

these areas, Eisenfeld Decl. ¶ 19, Guardians' injuries fall squarely within the "zone of interests"

NEPA was designed to protect.  *Lucero*, 102 F.3d at 448.

## II.   OSM'S APPROVAL OF THE EL SEGUNDO MINING PLAN VIOLATED NEPA'S PROCEDURAL REQUIREMENTS

OSM violated NEPA's procedural requirements.  First, OSM failed to provide notice to

the public of the availability of its FONSI for the El Segundo Mining Plan along with the

existing EA adopted in support of the approval, or to involve the public in its decision-making

process in any manner.  Second, in adopting BLM's Leasing EA, OSM failed to show on the

record that it evaluated the adequacy of the EA for approval of the Mining Plan.  OSM's

procedural NEPA violations are part of an ongoing pattern and practice of the agency taking

federal action—approving mining plan modifications—without complying with NEPA's public involvement and environmental analysis adoption requirements.  OSM does not have the discretion to ignore these mandates.

    **A.    OSM Failed to Involve the Public in the Decision to Approve the El Segundo Mining Plan.**

        **1.    NEPA's public involvement requirements.**

NEPA regulations provide that "public scrutiny [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).  "Federal agencies shall to the fullest extent possible . . . [e]ncourage and facilitate public involvement in decisions which affect the quality of the human environment," [m]ake diligent efforts to involve the public in preparing and implementing their NEPA procedures," and provide "public notice of . . . the availability of environmental documents so as to inform those persons . . . who may be interested or affected."  40 C.F.R. §§ 1500.2(d), 1506.6(a), 1506(b).  Moreover, Interior's NEPA regulations specifically require that OSM "must notify the public of the availability of an environmental assessment and any associated finding of no significant impact once they have been completed."  43 C.F.R. § 46.305(c).  "[B]y requiring agencies . . . to place their data and conclusions before the public . . . NEPA relies upon democratic processes to ensure—as the first appellate court to construe the statute in detail put it—that 'the most intelligent, optimally beneficial decision will ultimately be made.'"  *Or. Nat. Desert Ass'n. v. BLM*, 625 F.3d 1092, 1099 (9th Cir. 2016) (quoting *Calvert Cliffs' Coordinating Comm'n v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971)).  This process, in turn, ensures open and honest public discussion "in the service of sound decisionmaking." *Id.* at 1122.

Although "NEPA's public involvement requirements are not as well defined when an agency prepares only an EA and not an EIS," *Greater Yellowstone Coal. v. Flowers*, 359 F.3d

1257, 1279 (10th Cir. 2004), NEPA's regulations require that agencies "involve . . . the public, to the extent practicable, in preparing [EAs]."  40 C.F.R. § 1501.4(b); *see also Dine CARE v. Klein*, 747 F. Supp. 2d 1234, 1261 (D. Colo. 2010) (accord).  This involvement does not necessarily require circulation of draft or final EAs for public comment; however, the agency must make "a meaningful effort to provide information to the public affected by an agency's actions." *Klein*, 747 F. Supp. 2d at 1262; *see also Greater Yellowstone Coal.*, 359 F.3d at 1279 n.18 (holding public involvement in EA process legally adequate where the agency did not provide a comment period for an EA but did hold several public meetings discussing alternatives and environmental impacts); *Bering Strait Citizens for Responsible Res. Dev. v. COE,* 524 F.3d 938, 953 (9th Cir. 2008) (recognizing that "[a]n agency, when preparing an EA, must provide the public with sufficient environmental information, considered in the totality of circumstances, to permit members of the public to weigh in with their views and thus inform the agency decision-making process.").

### 2.   OSM failed to provide for any public participation in its FONSI for the Mining Plan.

OSM failed to satisfy NEPA's public notice and participation requirements in approving the mining plan for the El Segundo Mine.  The agency did not notify the public, either prior to or immediately following the Assistant Secretary's approval of the Mining Plan, that it has issued a FONSI and that it had adopted BLM's Leasing EA in lieu of doing any additional analysis of mining's environmental impacts.  Instead, OSM prepared the FONSI as an internal document only.  AR 3884.  Internal email communication show that OSM did not even start the process for making the Mining Plan decision documents publicly available on the agency's website until four months after the decision.  AR 3885 (email dated Sept. 2, 2014).  The record indicates that on October 23, 2014—five months after the Assistant Secretary approved the Mining Plan and

six months after OSM approved the FONSI—the Mining Plan decision documents were still not

posted on OSM's website.  AR 3892 (email dated Oct. 23, 2014).  Posting decision documents

on OSM's website several months after approval of the Mining Plan without any notice to the

public does not satisfy Interior's own regulation that the agency "*notify* the public of the

availability of an environmental assessment and any associated finding of no significant impact

once they have been completed."  43 C.F.R. § 46.305(c) (emphasis added).

In two recent decisions in the Districts of Colorado and Montana where Guardians

challenged OSM mining plan approvals on similar grounds, including failing to ensure the public

was appropriately involved in and notified about those approvals, the courts held that OSM's

practice of preparing FONSIs and mining plan approvals through a wholly internal process

violated NEPA's public involvement requirements.  In *WildEarth Guardians I*, 104 F. Supp. 3d

at 1224 (citing 43 C.F.R. § 46.305(c)), the court found OSM's practice of "silently plac[ing] hard

copies of its completed EAs and FONSIs on a shelf in its high-rise office . . . in Denver" failed to

satisfy NEPA's public involvement requirements.  Based on similar facts regarding OSM's

practice of making mining plan decision documents available in the agency's Denver office, the

court in *WildEarth Guardians II*, 2015 WL 6442724 at *7, also rejected this practice as

complying with NEPA's public involvement requirements.  There, the Court found a "complete

lack of notice" where the administrative record "include[ed] no suggestion of public notice by

the Federal Defendants of the FONSI" nor any "indication . . . that the FONSI actually was

placed in a reading room in Denver."  *Id*. at *7.  As these courts have made clear, the

requirement that these NEPA documents be made available for public review is meaningless if

the public does not know that such documents exist or that the agency has taken final action on

the decision analyzed in those documents.

Here, as in *WildEarth Guardians I and II*, OSM made no meaningful efforts to either "[e]ncourage and facilitate public involvement" or "involve . . . the public, to the extent practicable" in any stage of the mining plan approval.  40 C.F.R. §§ 1500.2(d), 1501.4(b).  This failure is contrary to the basic purpose of public involvement: to prompt a dialogue between OSM and the public and to trigger responsive agency action such as "[s]upplement[ing], improv[ing], or modify[ing] its analyses."  40 C.F.R. § 1503.4(a).

Moreover, OSM cannot discharge NEPA's public participation requirement through the State's public process for the SMCRA permit.  Although the Mine's SMCRA permit application was available for public comment, AR 247, and the State's final permitting decision was noticed in a local newspaper, AR 3122, the availability of State documents for public review does not satisfy OSM's *independent* obligation to inform the public about the potential environmental impacts of mine expansion and solicit meaningful public input as part of the agency's NEPA process.  SMCRA explicitly prohibits OSM from delegating NEPA compliance to the State.  30 C.F.R. § 745.13(b).  Nor does the record contain any indication that the State's permitting decision put the public on notice that El Segundo Mine's proposed expansion was subject to federal oversight and approval or that OSM was planning to adopt an EA prepared by a different agency that would serve as the sole basis for OSM's FONSI.  And involving the public in OSM's NEPA process is one of NEPA's requirements.  40 C.F.R. § 1500.2(d); *see also Or. Nat. Desert Ass'n*, 625 F.3d at 1120 (holding that "public scrutiny is essential to implementing NEPA."). For these reasons, OSM cannot rely on the State's public notice of its permitting process to satisfy the federal agency's NEPA obligations.

Posting the approved Mining Plan and FONSI to OSM's website months after the decision has been made does not satisfy NEPA's public involvement requirements.  As the Court

stated in *Klein*, 747 F. Supp. 2d at 1262: "[a]dequate notice requires a meaningful effort to provide information to the public affected by an agency's actions."  By not including the public in its decisionmaking process for the Mining Plan, OSM violated NEPA's public notice and participation provisions.

### B.     OSM's Adoption of the Leasing EA Without Independently Assessing Whether the EA Complied with NEPA was Arbitrary.

Where a federal agency adopts an EA or EIS under NEPA, the agency is required to provide "appropriate supporting documentation, that [the adopted EA or EIS] adequately assesses the environmental effects of the proposed action and reasonable alternatives." 43 C.F.R. § 46.120(c).  Such supporting documentation "must include an evaluation of whether new circumstances, new information or changes in the action or its impacts not previously analyzed may result in significantly different environmental effects."  *Id.*  When an agency adopts an existing NEPA analysis to support a FONSI, courts review the two documents together to determine the sufficiency of the environmental analysis as a whole.  *Pennaco Energy, Inc. v. USDOI*, 377 F.3d 1147, 1159-60 (10th Cir. 2004) (to determine whether BLM complied with NEPA when it adopted two previous EISs in lieu of doing a site-specific NEPA analysis, the Court reviewed the impacts discussions in the EISs).  The NEPA documents adopted must fully address the environmental consequences of the proposed action.  *Id.* at 1151.  In addition, when an agency relies on existing NEPA documents to comply with its obligations under the statute, the agency is required to supplement existing NEPA analyses when "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(ii).

Accordingly, although the NEPA regulations allow OSM to adopt existing NEPA analyses to avoid duplication of effort, the agency cannot satisfy its NEPA compliance obligation

in this manner if the adopted documents do not contain specific information about the environmental impacts of the proposed action, or where the specific conditions underlying the prior analysis have since changed. *Pennaco*, 377 F.3d at 1154. As the Supreme Court and Tenth Circuit have recognized, an agency must supplement an environmental analysis where the proposed action "will affect the quality of the human environment in a significant manner or to a significant extent not already considered." *Marsh v. ONRC*, 490 U.S. 360, 374 (1989); *Friends of Marolt Park v. USDOT*, 382 F.3d 1088, 1096 (10th Cir. 2004) (citing *Marsh* for this principle).[7]

Finally, even though the Leasing EA was produced by a federal agency subject to NEPA, OSM may not adopt the EA without performing its own independent assessment. Attempting "to rely entirely on the environmental judgments of other agencies [is] in fundamental conflict with the basic purpose of NEPA." *Idaho v. Interstate Commerce Comm'n*, 35 F.3d 585, 595 (D.C. Cir. 1994) (citation and alteration omitted). An agency may adopt another agency's analysis only after "independent[ly] review[ing]" that analysis and explaining how it satisfies the reviewing agency's NEPA obligations. 40 C.F.R. § 1506.3(c); *see also* 42 U.S.C. § 4332(D) (agency remains "responsib[le] for the scope, objectivity, and content of the entire [NEPA] statement" ).

Here, OSM met none of these criteria when it adopted the Leasing EA to support the FONSI for the Mining Plan. Although OSM states that it "has independently reviewed the EA and finds that the EA complies" with the relevant regulations, the record is devoid of any

---

[7] Moreover, OSM "has a *continuing duty* to gather and evaluate new information relevant to the environmental impact of its actions." *Warm Springs Dam Task Force v. Gribble,* 621 F.2d 1017, 1023 (9th Cir. 1980) (emphasis added). As part of this duty, OSM must assess "the extent to which the new information presents a picture of the likely environmental consequences associated with the proposed action not envisioned by the original [environmental analysis]." *Wis. v. Weinberger*, 745 F.2d 412, 418 (7th Cir. 1984).

evidence showing OSM conducted an independent review of the Leasing EA to ensure that the analyses in that document adequately analyzed the environmental impacts of future mining. *See generally* AR 18-19 (FONSI), AR 9-13 (OSM's recommendation for mining plan approval). OSM neither cites to pertinent page numbers in the Leasing EA nor describes the EA's analyses and conclusions about mining's environmental impacts. As set forth in Section III.B below, the Leasing EA did not include analyses of air quality and GHG impacts that complied with NEPA. Importantly, in the Leasing EA BLM explicitly recognized that additional analyses of mining's environmental impacts would occur at the mine plan decision phase when OSM received the proposed mining plan from the lessee. AR 3670.

OSM produced similar FONSIs stating the agency has independently reviewed adopted EAs, but pointing to no record evidence demonstrating such a review had occurred in *WildEarth Guardians I and II*. Both courts found that this practice did not comply with NEPA. In *WildEarth Guardians II*, the court recognized that conclusory language about an independent review failed to explain how OSM took a hard look at the environmental impacts of the challenged mining plan:

> The FONSI, without any elaboration or explanation, simply states only the conclusion that it is based on the [leasing] EA, which "has been independently evaluated by OSM and determined to assess the environmental impacts of the proposed action adequately and accurately and to provide sufficient evidence and analysis for this finding of no significant impact." It does not explain, for example, why a six-year-old document can be exclusively relied upon in this regard, particularly when the earlier document expressly stated that it was not analyzing site-specific mining or reclamation plans.
> .......................
> Applying the applicable standards, the Court concludes that such conclusory statements do not comply with governing laws and regulations . . . Although the [leasing] EA was attached to the FONSI, there is no indication as to why and how an EA before the mining plan amendment application was filed properly analyzes its effects. Based on the lack of the required non-delegable environmental analysis in the NEPA documents at issue here . . . OSM failed to take a hard look under NEPA at their recommended approval of the [Spring Creek] mining plan amendment.

*WildEarth Guardians II*, 2015 WL 6442724, at *7 (internal citation to record omitted); *see also WildEarth Guardians I*, 104 F. Supp. 3d at 1226 (finding that "no citations are provided in support of [OSM's] declaration" that it independently reviewed environmental documents adopted for two mining plan approvals). *WildEarth Guardians II*'s analysis and holding are consistent with the Supreme Court's directive that a court should not dig through the record to provide a rationale for an agency decision that the agency has not itself provided. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (recognizing that if the basis for an agency's decision is not discernable from the record, "[t]he reviewing court should not attempt itself to make up for such deficiencies . . . [it] may not supply a reasoned basis for the agency's action that the agency itself has not given.") (citation omitted).

Accordingly, OSM's adoption of the Leasing EA was arbitrary because OSM failed to perform an independent review of that document on the record to ensure that it complied with NEPA, and failed to follow NEPA's procedure for adoption of preexisting documents.

## III.   OSM'S APPROVAL OF THE EL SEGUNDO MINING PLAN VIOLATED NEPA'S HARD LOOK REQUIREMENTS

### A.   OSM Failed to Analyze Coal Transport and Combustion as Indirect Impacts of Mining at the El Segundo Mine.

The El Segundo Mine provides coal for combustion at power plants in eastern Arizona, including the Apache Generating Station, Cholla Power Plant, and the Springerville Generating Station. AR 3745. Coal is transported to these power plants by rail. AR 3722. Therefore, coal combustion and transport are reasonably foreseeable indirect effects of OSM's Mining Plan approval that the agency must analyze and disclose to the public. 40 C.F.R. § 1508.8(b). Indirect effects are defined as effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," including "effects on air and

water and other natural systems, including ecosystems." *Id*. Neither OSM's FONSI nor the

Leasing EA on which the FONSI relies considered the indirect impacts of coal combustion and

transport. Therefore, OSM's FONSI was arbitrary and violated NEPA.

NEPA requires agencies to consider those effects that have a "reasonably close causal

relationship" to the agency action. *Metro. Edison Co. v. People Against Nuclear Energy*, 460

U.S. 766, 774 (1983); *see also Dept. of Transp. v. Public Citizen*, 541 U.S. 752, 767 (2004)

(reaffirming requirement for reasonably close causal relationship). "[A]gencies need not

consider highly speculative or indefinite impacts." *Sierra Club v. Marsh*, 769 F.2d 868, 878 (1st

Cir. 1985). Courts have previously held that agencies must consider foreseeable upstream and

downstream impacts of energy development. *See e.g., Mid-States Coal. for Progress v. Surf.*

*Trans. Bd.*, 345 F.3d 520, 549-50 (8th Cir. 2003) (held that because it was "reasonably

foreseeable" that rail line construction would lead to increased coal consumption, the EIS should

have analyzed the resultant air pollution as an indirect effect); *Border Power Plant Working*

*Group v. DOE*, 260 F. Supp. 2d 997, 1017 (S.D. Cal. 2003) (held that a NEPA analysis for two

new electricity transmission lines should have considered as "indirect effects" air pollution from

two upstream power plants).

### 1.    The Leasing EA did not analyze coal transport impacts.

BLM dismissed the need to perform any analysis of environmental impacts from rail

transport "because the project lease will not increase the rate of coal mined at El Segundo"

resulting in no subsequent "increase in rail transport" from mining the lease. AR 3723, 3745.

Although the number of coal trains per day may not change as a result of mining the federal

lease, the Mining Plan approval results in mining an additional 9.2 million tons of coal and

expands the life of the Mine for two years, thus extending coal transport and its attendant

environmental effects for two years or more.[8]  BLM ignores the facts that more coal will be mined and two years will be added to the life of the Mine, choosing to focus only on rail transport *rates* to reach the arbitrary conclusion that any environmental effects from coal transport will not be significant because those effects (which BLM does not identify) will not get worse if the lease is mined.

Moreover, courts have rejected similar "status quo" arguments for declining to analyze indirect impacts where a particular impact would allegedly not "increase" under a proposed action.  In *Dine CARE v. Klein*, 82 F. Supp. 3d 1201, 1214 (D. Colo. 2015), *vacated as moot*, OSM argued it did not have to analyze combustion-related effects because mine expansion would not increase the *rate* of combustion.  The court found the *additional* coal produced from a mining plan approval, rather than the combustion rate of that coal, to be the determinative factor for requiring analysis of combustion impacts.  *Id*. (holding that "[a]bsent OSM's approval of the proposed expansion, the environmental effects resulting from this additional combustion would not occur."); *see also South Fork Band Council of Western Shoshone of Nevada v. DOI*, 588 F.3d 718, 726 (9th Cir. 2009) (holding that agency violated NEPA by failing to consider indirect effects of off-site air pollution caused by subsequent processing of ore from mine expansion).  Relying on the Eighth Circuit's reasoning in *Mid-States*, *High Country Conservation Advocates v. USFS*, 52 F. Supp. 3d 1174, 1197-98 (D. Colo. 2014), similarly held that an agency had to analyze combustion impacts because "coal that otherwise would have been left in the ground will

---

[8] Although BLM admits that "the duration of mining may be prolonged" with development of the lease, the agency squarely dismisses the need to analyze coal transport impacts because "the annual emissions from transport of the coal via locomotive will remain unchanged."  AR 3845. Yet nowhere in the Leasing EA does BLM disclose current air pollutant or GHG emission levels from ongoing coal transport to allow an assessment of whether significant air quality impacts are already occurring.  Such "perfunctory references do not constitute analysis useful to a decisionmaker in deciding whether, or how, to alter [a project] to lessen cumulative environmental impacts."  *Natural Res. Def. Council v. Hodel*, 865 F.2d 288, 299 (D.C. Cir. 1988).

be burned," regardless of the agency's assertion that the same amount of coal would be mined and burned if the agency did not approve the lease.  Here, the Mining Plan results in production of an additional 9.2 million tons of coal that otherwise would be left in the ground.  AR 11.  Regardless of the rate at which this coal is mined, it will result in environmental impacts from transport and combustion, impacts that would not otherwise occur.

>  **2.   The Leasing EA's cursory discussion of combustion impacts does not satisfy NEPA.**

While BLM completely dismissed the need to analyze the environmental impacts of coal transport, the agency did estimate air pollutant and GHG emissions from combustion of the mined coal as a cumulative impact of mining the lease.  AR 3750.  However, BLM's discussion of combustion impacts was limited to making these estimates and reporting their contributions to regional air emissions (for air pollutants) and global and national GHG levels.  *Id*.  BLM did not place these emission levels in any context to be able to analyze the effect power plant emissions may have on regional air quality, future likelihood of remaining below federal standards for criteria air pollutants, or adding additional GHGs to the atmosphere.  These estimates, without any analysis of their significance or impacts, do not comply with NEPA's hard look requirement.  *See Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1216 (9th Cir. 2008) (finding quantification of carbon dioxide emissions alone in violation of NEPA when the agency "[did] not discuss the actual environmental effects resulting from those emissions").  By failing to perform any analysis of *impacts to air quality* and GHG levels from coal combustion, BLM failed to consider a relevant factor and important aspect of the problem.  *Motor Vehicle Mfrs.*, 463 U.S. at 43; *Olenhouse*, 42 F.3d at 1574.

Because OSM adopted an EA that did not analyze coal combustion and transport as indirect effects of mining, OSM also failed to consider a relevant factor and important aspect of

the problem.  *Motor Vehicle Mfrs.*, 463 U.S. at 43.  Therefore, OSM's decision to issue a FONSI

was arbitrary and a violation of NEPA.

     **B.**     **OSM Failed to Take a Hard Look at the Air Quality Impacts of Coal Mining at the El Segundo Mine.**

     Coal mining at the El Segundo Mine generates various air pollutants that degrade air

quality and compromise health, including particulate matter ("$PM_{10}$"), nitrogen dioxide ("$NO_2$"),

and ozone precursors.  Yet OSM failed to consider, before approving additional coal mining, the

impacts that 10 more years of these emissions would have on air quality.  The record shows that

OSM's NEPA compliance consists of a two-page FONSI that included *no* analysis of mining's

environmental impacts in general, or of impacts to air quality in particular.  As the basis for its

FONSI for the Mining Plan, OSM decided to forego doing its own analysis of environmental

impacts and instead adopted BLM's 2014 Leasing EA.  *See generally* AR 18-19 (FONSI).

However, as explained below the Leasing EA does not support a finding of no significant impact

to air quality.  Because OSM adopted an EA that failed to take a hard look at mining's air quality

impacts, and OSM did not do its own analysis of air quality impacts before approving the Mining

Plan, OSM "entirely failed to consider an important aspect of the problem" and its approval is

therefore arbitrary.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

     **1.**     **The Leasing EA arbitrarily dismisses $PM_{10}$ exceedances.**

     Particulate matter less than 10 microns in diameter, or $PM_{10}$, is a criteria pollutant under

the Clean Air Act.  *See* 71 Fed. Reg. 61,144 (Oct. 17, 2006). Pursuant to the Clean Air Act, EPA

promulgated a National Ambient Air Quality Standard ("NAAQS") for $PM_{10}$ limiting 24-hour

$PM_{10}$ concentrations to no more than 150 $\mu g/m^3$. *Id.* at 61,202.  According to EPA, health

effects associated with *short-term* exposure to $PM_{10}$ include "aggravation of respiratory and

cardiovascular disease (as indicated by increased hospital admissions), increased respiratory

symptoms in children, and premature mortality." *Id.* at 61,178.  The EA includes $PM_{10}$ as one of the air quality standards applicable to BLM's analysis of leasing impacts, and notes that coal extraction, storage, overburden removal, blasting, and haul trucks are the primary $PM_{10}$ emission sources at the Mine.  AR 3687.

BLM failed to take a hard look at the direct impacts of lease development on the 24-hour $PM_{10}$ standard as required by NEPA.  In the Leasing EA, BLM recognizes that emissions from surface coal mining are predominantly particulate matter," requiring the agency to consider the impact of these emissions on air quality.  However, the EA's Air Quality section does not consider whether short-term $PM_{10}$ emission levels from *future* mining activities on the lease would approach or exceed the 24-hour standard or, even if emission levels would not lead to violation of the standard, the extent to which $PM_{10}$ emissions would degrade short-term air quality.  Instead, BLM makes the conclusory statements that impacts to the 24-hour and annual particulate matter standards "will not increase" over the 10-year period of mining the lease because "the rate of production and the annual production would not increase as a result of the Proposed Action."  AR 3724.  The record does not support this conclusion.  First, record evidence directly contradicts BLM's conclusion that annual $PM_{10}$ levels will not increase, as shown by annual $PM_{10}$ emissions estimates from 2014-2023.  AR 3817.  According to BLM's data, there is an eightfold increase in annual $PM_{10}$ emission levels by 2023, with smaller increases occurring throughout the 10-year period, rendering arbitrary BLM's conclusion that $PM_{10}$ standards will not be affected by mining the lease.  *Id.*

Second, there is no evidence in the record supporting BLM's conclusion that 24-hour $PM_{10}$ levels will be unaffected by mining the lease.  The only data provided in the EA relating to 24-hour $PM_{10}$ levels around the Mine demonstrates that a number of 24-hour $PM_{10}$ exceedances

have occurred since the Mine opened in 2008, AR 3689 (Table listing 15 exceedances of the 24-hour $PM_{10}$ standard), suggesting that current mining was having an impact on 24-hour $PM_{10}$ levels.  Yet BLM arbitrarily dismissed these exceedances as anomalies from "high winds or inversions" without providing any supporting explanation for not taking this data into account in its analysis.  AR 3688.  In an earlier version of the Leasing EA, BLM tried to dismiss these exceedances by labeling them "exceptional events," AR 3184 (November 2013 EA), a term in Clean Air Act regulations use to denote exceedances excluded from monitoring data used to determine if an area has violated a NAAQS for a particular pollutant.  *See* 40 C.F.R. § 50.14 (outlining process for EPA determination of an exceptional event); 40 C.F.R. § 50.1(j) (defining "exceptional event").  However, only the EPA Administrator is authorized to make a determination that an exceedance qualifies as an exceptional event, and the regulatory definition explicitly excludes "stagnation of air masses or meteorological inversions" from the category of exceptional events.  40 C.F.R. § 50.1(j).  After Guardians pointed this out to BLM in its EA comments, AR 3914-15, the agency admitted that it "cannot claim exceptional events" and removed the "exceptional events" label from the exceedances in the final  EA.  AR 3845.  However, BLM still dismissed as anomalies the 24-hour $PM_{10}$ exceedances in the final EA, and made no attempt to analyze the significance of the exceedances or whether additional exceedances were likely from mining the lease.  AR 3688.  Thus, BLM both "failed to consider an important aspect of the problem" and reached a conclusion that "runs counter to the evidence before" it when it arbitrarily dismissed as anomalies several 24-hour $PM_{10}$ exceedances.  *Motor Vehicle*, 463 U.S. at 43.

Finally, BLM's argument that mining the federal lease will not increase $PM_{10}$ impacts because coal production rates will stay the same is not reasonable.  As already discussed in

Section III.A.1 above, courts have rejected this "status quo" argument as unreasonable and have not allowed agencies to use this argument as an excuse for not analyzing a project's impacts. Moreover, as the court in *Guardians I*, 104 F. Supp. 3d at 1227, framed the issue: the question is not whether emissions from proposed mining will release air pollutants but rather whether the emissions from proposed mining "will have a significant effect on the environment."  Regardless of the rate at which this coal is mined, mining an additional 9.2 millions tons of coal will produce $PM_{10}$ emissions and their attendant impacts that would not otherwise occur.  Because BLM did not analyze these impacts, OSM was required to do so before it approved the Mining Plan.

### 2.    The Leasing EA did not address ozone impacts.

Ground-level ozone[9] is a dangerous pollutant that has a "causal relationship . . . with a range of respiratory morbidity effects, including lung function decrements, increased respiratory symptoms, airway inflammation, increased airway responsiveness, and respiratory-related hospitalizations and emergency department visits."  73 Fed. Reg. 16,436, 16,443 (Mar. 27, 2008).  Furthermore, EPA has stated that the latest scientific evidence regarding ozone effects "is highly suggestive that [ozone] directly or indirectly contributes to non-accidental and cardiorespiratory-related mortality," including "premature mortality."  *Id*.  EPA has concluded that individuals with asthma are at particular risk from the adverse effects of ozone.  *Id*. Pursuant to the Clean Air Act, EPA established a National Ambient Air Quality Standard ("NAAQS") for ozone at 0.075 parts per million ("ppm") over an eight-hour period.  73 Fed. Reg. 16,436.  In the EA, BLM recognizes that mining activities emit ozone precursors.  AR 3687.

---

[9]  Ozone is formed when the ozone precursors nitrogen oxide ("$NO_x$") and volatile organic compounds ("VOC") react with sunlight.  AR 356.  Overburden removal and coal blasting events, tailpipe emissions from coal mining equipment, and emissions from trains used to haul coal from mines produce these ozone precursors.  *Id*.

Coal mining activities produce ozone precursors, particularly NOx emissions.  AR 3687,
3819 (Table 3.3-3, EA Apx. D).  Appendix D of the Leasing EA provided estimates of annual
NOx emissions from mining activities in tabular form, but did not translate these estimates into
estimated ozone levels from mine expansion. AR 3819; *see also* AR 3724 (presenting annual
NOx and VOC emissions from tailpipe emissions and blasting as ranging between 22.5 and
126.7 tpy for NOx, and 1.15 and 6.47 tpy for VOCs).  Although the D.C. Circuit has upheld use
of NOx emissions as a proxy for ozone emissions, the Court there did so based on the agency's
"extensive discussion of . . . NOx" and NOx emission reduction measures in an EIS."  *WildEarth
Guardians v. Jewell*, 738 F.3d 298, 311-12 (D.C. Cir. 2013).  No such "extensive discussion" of
NOx is included in the Leasing EA.  Instead, BLM simply states that because "annual production
would not increase as a result of the Proposed Action, no change to annual and short-term NOx
emissions would occur, but emissions would persist for 1-2 years longer than if the area were not
mined."  AR 3724.

Because there has been no prior analysis of impacts to air quality from ozone emissions
resulting from the El Segundo Mine, OSM was required to take a hard look at these impacts
before approving the mine expansion.  OSM has not done so, therefore its approval of the mining
plan violates NEPA.

### 3. The EA fails to take a hard look at NO$_2$ impacts.

NO$_2$ is a criteria pollutant under the CAA.[10]  According to EPA, "[e]pidemiologic
evidence exists for positive associations of short-term ambient NO$_2$ concentrations below the
current NAAQS with increased numbers of emergency department visits and hospital admissions
for respiratory causes, especially asthma."  *See* 74 Fed. Reg. 34,404, 34,413 (July 15, 2009).

---

[10]  The NO$_2$ annual standard is 53 parts per billion ("ppb").  On February 9, 2010 EPA
promulgated a one-hour NO$_2$ standard of 100 ppb to protect respiratory health.  75 Fed. Reg.
6,474-6,537 (Feb. 9, 2010).  This NAAQS became effective on April 12, 2010.

The EA includes $NO_2$ as one of the air quality standards applicable to BLM's analysis of leasing impacts, and noted that overburden blasting is a source of $NO_2$ emissions at the Mine.  AR 3724.

In the EA, BLM makes the conclusory statements that impacts to the 1-hour $NO_2$ standard will "not increase" over the 10-year period of mining the lease, and that because NOx emissions from mining the lease would be "relatively small," $NO_2$ emissions "would be expected to" not exceed the standard.[11]  AR 3724, 3823.  There is no record evidence to support these conclusions.  First, BLM provided no data on current 1-hour $NO_2$ levels from ongoing mining that would allow the reader to assess local air quality conditions as a baseline to which future $NO_2$ emissions would contribute.  Second, BLM appears to have reached the conclusion that 1-hour $NO_2$ levels would not exceed the standard by using *annual* NOx emissions as a proxy for $NO_2$ without providing any explanation as to *how* it reached this conclusion using emissions of a different pollutant measured at a different temporal scale.  AR 3823.  Even if there was evidence in the record to support BLM's use of annual NOx emissions as a proxy for 1-hour $NO_2$ emissions (which there is not), the NOx emissions estimates for the 10-year life of the lease show a nearly continuous *increase* in annual NOx emissions to 2020 before levels begin to decrease, directly contradicting any representations that mine expansion will not cause an increase in air emissions.  AR 3819 (Table 3.3-3 showing annual NOx levels from 2014-2023).

Finally, tools were available to BLM for analyzing the air quality impacts that would result from $NO_2$ emissions over the life of the lease.  In its comments on the Leasing EA, Guardians urged BLM to conduct dispersion modeling for $NO_2$ impacts using modeling tools

---

[11] As discussed above in Section III.A.1 above, *Dine CARE v. Klein* rejected a similar "status quo" argument as an excuse for not doing an impacts analysis.

recommended by EPA and already in use by other agencies.[12]  AR 3915 (Exhibit 1); *see also* AR 3922-54 (example of 1-hr $NO_2$ dispersion modeling conducted by the U.S. Forest Service). Because existing $NO_2$ monitors are more than 100 miles away from the project area, these monitors are unlikely to pick up $NO_2$ emissions from the El Segundo Mine.  *Id*.  As BLM itself pointed out, levels of a given air pollutant "are most accurately characterized by actual measurements in close proximity to surface mining operations," rendering distant $NO_2$ monitors ineffectual for assessing the Mine's $NO_2$ impacts.  AR 3687.  Because the 1-hour $NO_2$ standard is meant to prevent health impacts from short-term exposure occurring near a source, and tools for assessing these impacts were available to BLM, the agency's decision not to do this analysis and its unsupported conclusions regarding $NO_2$ impacts were arbitrary.

## C.    The Leasing EA Failed To Take A Hard Look at Impacts from the Lease's Greenhouse Gas Emissions.

OSM violated NEPA by relying on an EA that partially disclosed the amount of greenhouse gas ("GHG") pollution from foreseeable coal mining and combustion, but failed to take the essential next step required for a "hard look:" disclosing the *impacts* of GHG emissions from coal mining and combustion.[13]  Although in its Leasing EA BLM estimated the GHG emissions from mining and burning an additional 9.2 million tons of El Segundo coal, the agency stopped short of employing a readily-available tool—the social cost of carbon—to inform the public about the environmental impact of those emissions.  An isolated calculation of the amount

---

[12] In its response to EA comments, BLM declined to perform any analysis of 1-hour $NO_2$ impacts, stating that "[b]ecause the rate of mining is not increasing overall, 1-hour $NO_2$ impacts will not change due to mining in the project area."  AR 3846.

[13] Carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride are recognized as greenhouse gases.  In 2009, EPA found that these "six greenhouse gases taken in combination endanger both the public health and the public welfare of current and future generations."  74 Fed. Reg. 66,496 (Dec. 15, 2009).

of GHG emissions that would result from mining and burning coal from a particular federal lease provides no meaningful insight as to the effect those emissions will have on the environment.

By contrast, and as explained in detail below, the social cost of carbon offers an actual estimate of the damage caused by each incremental ton of GHG emissions added to the atmosphere.  Moreover, if BLM believed that there were no tools available to analyze the impacts from mining's GHG emissions, then it needed to clearly show, rather than merely assert, that such information was lacking.  40 C.F.R. § 1502.22.  BLM did not do this, therefore the Leasing EA did not take a hard look at the environmental impacts of GHG emissions.  It follows that because OSM relied on the EA's arbitrary conclusions regarding GHG impacts without conducting its own review of the adequacy of the EA's analysis and conclusions, OSM's determination that mining the lease would have no significant environmental impacts from GHG emissions was also arbitrary.

In the Leasing EA, BLM estimated that operations at the El Segundo Mine directly produced 112,000 metric tons of $CO_{2e}$ emissions annually.[14]  AR 3691.  The EA also included an estimate of GHG emissions from combustion of the mined coal, using a calculation that "combustion of one ton of coal from the [lease] tract will produce 1.76 metric tons of $CO_2$."  AR 3750.  BLM determined that burning all of the coal from the lease tract (9.21 million tons) would cause 16.2 million metric tons ("Mmt") of GHG pollution over the 10-year period of the lease.  *Id*.  Annual average emissions from coal combustions would be 1.62 Mmt of $CO_2$ using this formula.  *Id*.  BLM then compared these project-level emissions to state, national, and global GHG totals and concluded that GHG emissions resulting from lease authorization would be "small" and therefore insignificant.  AR 3752.

---

[14] The measure $CO_{2e}$ refers to carbon dioxide ("$CO_2$") equivalent.  This equivalency measure is used because of the variability in the "global warming potential" of each of the gases that make up greenhouse gases.  AR 3690.

Essentially, BLM used the *amount* of GHG emissions as a proxy for the *impacts* of these emissions, and assumed that because the lease's numeric contribution to global and national GHG levels would be small, that any environmental impacts from project emissions would be correspondingly small.  However, there is no record evidence supporting this proxy approach for assessing the significance of project-level GHG emissions, and courts have squarely rejected this approach as sufficient to comply with NEPA.  *See, e.g.*, *Center for Biol. Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1216.

Moreover, in failing to assess the impacts of the project's GHG emissions, BLM did not comply with NEPA's requirement that it explain why the agency could not do so.  An agency must "evaluate reasonably foreseeable significant adverse effects on the human environment," even where information relevant to making this evaluation is "incomplete or unavailable."  40 C.F.R. § 1502.22.  If, as BLM asserts in the EA, tools were not available to analyze GHG impacts, the agency must clearly show that such information is lacking by providing the credible scientific information it does have on these reasonably foreseeable impacts and making an effort to analyze these impacts based on the available information.  *Id.*

Under the applicable NEPA regulations, if an agency intends not to include essential information in its NEPA review, it "shall" explain (1) why such essential information is incomplete or unavailable; (2) its relevance to reasonably foreseeable impacts; (3) a summary of existing science on the topic; and (4) the agency's evaluation based on any generally accepted theoretical approaches.  40 C.F.R. § 1502.22(b).  Despite BLM's claim that tools were unavailable to analyze the impacts associated with the lease's GHG emissions, nowhere in the Leasing EA's discussions of GHG emissions is it apparent that BLM met or attempted to meet the requirements of 40 C.F.R. § 1502.22.  Stating that tools are unavailable to analyze the

climate impacts of a project's GHG emissions is not enough.  BLM was required to discuss the tools that were available to analyze the social and environmental impacts of project-level GHG impacts because, as discussed in detail in the following section, such a tool was available to BLM at the time it was working on the Leasing EA.[15]

In the Leasing EA, BLM disavowed needing to go beyond estimating GHG emissions to actually analyzing the impacts of these emissions by claiming that there were no adequate tools to measure local or global climate impacts from mining's "incremental" GHG emissions.  AR 3725; *see also* AR 3691 (stating "current climate models are not available to predict with sufficient precession [sic] the localized climate impacts resulting from global climate changes."), 3751 (stating "it is not possible to attribute complex global climate change reactions within the environment to a particular source of GHG emissions.").  Although current climate models cannot predict local impacts to climate from a particular GHG emission source, a tool does exist for evaluating the environmental costs of project-specific GHG emissions, even where those emissions make up only a small fraction of national or global emissions.

The social cost of carbon protocol, created by a working group comprised of several federal agencies and scientists, is one generally accepted approach to evaluating the impacts of a proposed action's greenhouse gas emissions.  *High Country*, 52 F. Supp. 3d at 1190. This protocol, first released in 2010 and updated in May 2013, was available to BLM at the time it was preparing the EA and to OSM at the time it was deciding whether to adopt the leasing EA. The social cost of carbon is "designed to quantify a project's contribution to costs associated

---

[15] BLM briefly mentions that it was also not required to analyze the impacts of GHG emissions from mining because the Mine's methane emissions levels fell below the 100,000 tons/year permitting threshold for a "major source" of GHG emissions under EPA's Tailoring Rule and Title V of the Clean Air Act.  AR 3725.  However, this excuse fails because Clean Air Act permitting requirements are separate from NEPA's requirement that an agency take a hard look at the direct, indirect, and cumulative impacts to the environment regardless of whether a Clean Air Act permit is also required for a proposed action.  *Guardians I*, 104 F. Supp. 3d at 1227.

with global climate change." *Id*.  It is intended to include changes in net agricultural productivity, human health, property damages, and the value of ecosystem services, all of which climate change can degrade.[16]  Although the protocol was initially designed as an analytical tool to assist agencies with rulemaking, EPA has recommended that agencies use the protocol in NEPA reviews.  *High Country*, 52 F. Supp. 3d at 1190.[17]

> BLM's decision to avoid analyzing leasing's GHG impacts by invoking the global nature of climate change impacts and the unavailability of tools to analyze GHG impacts was not reasonable.  *See, e.g., Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d at 1217 ("[T]he fact that climate change is largely a global phenomenon that includes actions that are outside of the agency's control does not release the agency from the duty of assessing the effects of *its* actions on global warming within the context of other actions that also affect global warming.").  Therefore, BLM's GHG discussion in the EA did not comply with NEPA.  OSM's wholesale adoption of the EA—without any analysis of the evaluations and conclusions in the EA—was arbitrary, as is OSM's FONSI which relied on the EA's analyses and conclusions.

## CONCLUSION

> For the reasons stated above, Guardians respectfully requests that this court (1) declare that Federal Defendants' approval of the El Segundo Mining Plan violated NEPA, and (2) remand the El Segundo Mining Plan approval to Federal Defendants for compliance with NEPA.

---

[16] Cass R. Sunstein, *The Real World of Cost-Benefit Analysis: Thirty-Six Questions (and Almost as Many Answers)*, 114 Colum. L. Rev. 167, 171-73 (Jan. 2014) (describing origins of interagency agreement on the social cost of carbon).

[17] *See also* Sarah E. Light, *NEPA's Footprint: Information Disclosure as a Quasi-Carbon Tax on Agencies*, 87 Tul. L. Rev. 511, 545-46 & n.160 (Feb. 2013) (describing EPA recommendation that State Department, in evaluating impacts of Keystone XL Pipeline, "explore … means to characterize the impact of the GHG emissions, including an estimate of the 'social cost of carbon' associated with potential increases of GHG emissions.").

Respectfully submitted on this 11th day of November, 2016.

/s/ Samantha Ruscavage-Barz                Stuart Wilcox
WildEarth Guardians                        WildEarth Guardians
516 Alto Street                            2590 Walnut St.
Santa Fe, NM 87501                         Denver, CO 80205
(505) 401-4180                             (720) 331-0385
sruscavagebarz@wildearthguardians.org      swilcox@wildearthguardians.org

*Attorneys for Petitioner WildEarth Guardians*

### CERTIFICATE OF SERVICE

I certify that a copy of the foregoing Opening Brief and attached exhibit are being filed with the Clerk of the Court using the CM/ECF system, thereby serving it on all parties of record, this 11th day of November, 2016.

/s/ Samantha Ruscavage-Barz_____

### CERTIFICATE OF WORD LIMIT COMPLIANCE

Pursuant to Rule 32(a)(7)(B)(1) of the Federal Rules of Appellate Procedure, I hereby certify that this Opening Brief contains 11,532 words.  I relied on my word processing program, Microsoft Word, to obtain this word count.

/s/ Samantha Ruscavage-Barz